# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

MICHAEL MATALKA,

    Plaintiff,

v.

HOME POINT FINANCIAL CORPORATION,

    Defendant.

Case No. 2:17-cv-155
CHIEF JUDGE EDMUND A. SARGUS, JR.
Magistrate Judge Elizabeth P. Deavers

## OPINION AND ORDER

Defendant Home Point Financial Corporation ("Home Point") has two motions before the Court: a Motion to Compel Arbitration (ECF No. 5) and a Motion for Extension of Time to File Reply (ECF No. 10). For the following reasons, the Court **GRANTS** the Motion for Extension and **DENIES** the Motion to Compel Arbitration.

### I.

This case stems from an employment dispute between Home Point and Plaintiff Michael Matalka. Matalka alleges that Home Point recruited him to fill two positions: he was to be a Branch Manager and a Mid-Western Regional Manager. (Compl. ¶ 9, ECF No. 2.) As a Branch Manager, Matalka's primary duty was managing a branch office. (*See* Resp. at 6, ECF No. 8.) As a Regional Manager, Matalka helped Home Point build a retail mortgage division, supported the retail mortgage division's national sales functions, helped develop marketing service agreements, and hired and recruited loan officers and offices for Home Point. (*Id.*) Matalka represents that he did not receive benefits or bonuses as a Branch Manager and that he was compensated in that position based on branch profits. (*Id.* at 7.) In the Regional Manager position, by contrast,

Matalka represents that he received a base salary, benefits, and additional performance-based compensation. (*See id.* at 6–7.)

Matalka alleges that separate employment agreements governed each position. (*See* Compl. ¶¶ 13, 16.) He entered into both agreements on April 6, 2015. (*See id.*) A written employment agreement—the Branch Manager Agreement—governs Matalka's employment as a Branch Manager. (*Id.* ¶ 13).) And an oral contract governs Matalka's employment as a Regional Manager. (*Id.* ¶ 16.) The oral contract does not include an arbitration clause. (Resp. at 2.) The Branch Manager Agreement does. (Compl. ¶ 14.)

Alleging that Home Point failed to pay him under the oral contract or provide any of the other benefits owed under that agreement for his work as a Regional Manager, Matalka brought this case in February 2017 in the Franklin County Court of Common Pleas. (*See* Compl. at 1, 5–7.) Matalka asserts five claims that purportedly relate only to the oral contract and his work as a Regional Manager: (1) breach of oral contract; (2) unjust enrichment; (3) accounting; (4) fraud; and (5) punitive damages. (*Id.* ¶¶ 27–48.) Home Point has since removed the case to this Court on the basis of diversity jurisdiction. (*See* Notice of Removal at 1, ECF No. 1.) Pointing to the arbitration clause in the Branch Manager Agreement, Home Point now moves the Court to compel arbitration and dismiss Matalka's claims. (*See* Mot. to Compel Arb. at 1, 5–9, ECF No. 5.)

Before deciding whether to compel arbitration, the Court first resolves a preliminary matter. During the briefing of its Motion to Compel Arbitration, Home Point moved for an extension of time to file a reply brief. (Mot. for Extension at 1, ECF No. 10.) Because the request is unopposed, and supported by good cause, the Court grants the Motion for Extension and will consider Home Point's reply in deciding the Motion to Compel Arbitration. (*See id.*)

2

**II.**

The arbitration clause in the Branch Manager Agreement reads, in relevant part, as follows:

> J. **Arbitration:** All disputes, controversies, and claims, between Branch Manager and Employer arising out of or relating directly or indirectly to this Agreement shall be resolved by final and binding arbitration, conducted in accordance with the then current commercial arbitration Rules of the American Arbitration Association ("AAA"), as then in effect, except as provided herein. This submission and agreement to arbitrate shall be specifically enforceable.
>
> The matter shall be heard and decided, and award rendered, [by a] single neutral arbitrator selected by the AAA from the AAA National Panel of Commercial Arbitrators. The arbitrator selected to perform any arbitration hereunder: (a) may interpret Employer policies or procedures but shall not have the power or authority to change or modify such policies or procedures; (b) shall not have any power to alter or deviate from Branch Manager's at-will employment; and (c) shall have the power and authority to award rights and remedies that otherwise would have been available had the Parties engaged in dispute resolution through a jury or non-jury trial, including payment of attorney's fees, where applicable.
>
> Without limiting the generality of the foregoing[,] the following shall be considered controversies for this purpose: (a) all questions relating to the breach of any obligation, warranty, or condition hereunder, or relating to the termination of this Agreement; (b) all questions relating to the representations, negotiations and other proceedings leading to the execution hereof; (c) failure of either party to deny or reject a claim or demand from the other party; (d) all questions as to whether the right to arbitrate any question exists.

(Agreement § V(J), at PageID 58–59, ECF No. 5.)

**A.     Legal Standard**

The Federal Arbitration Act ("FAA") provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Congress's "preeminent concern . . . in passing the [FAA] was to enforce private agreements into

3

which parties had entered." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). In line with that concern, the FAA authorizes federal courts to compel arbitration when a party to a dispute has refused to arbitrate as required under a written agreement. *See* 9 U.S.C. § 4.

When a party seeks to compel arbitration under a written agreement, the critical question is whether the parties agreed to arbitrate the dispute at issue. *See Stout v. J.D. Byrider*, 228 F.3d 709, 714 (6th Cir. 2000). The court, not the arbitrator, must answer this question unless the parties have clearly and unmistakably provided otherwise. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986); *see also Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68–70 (2010) ("We have recognized that parties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. . . . An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other.").

When deciding a motion to compel arbitration, a court has four tasks. *Stout*, 228 F.3d at 714. First, it must determine whether the parties agreed to arbitrate. *Id.* Second, it must determine the scope of the arbitration agreement. *Id.* Third, it must consider whether Congress intended any federal statutory claims asserted by the parties to be nonarbitrable. *Id.* And fourth, if it concludes that some, but not all, of the claims in the action are subject to arbitration, the court must decide whether to stay the remainder of the proceedings pending arbitration. *Id.*

Arbitration is a matter of contract between parties, and a court cannot require litigants to arbitrate a dispute that they did not agree to submit to arbitration. *Simon v. Pfizer, Inc.* 398 F.3d 765, 775 (6th Cir. 2005). Nonetheless, given the federal policy favoring arbitration agreements

4

manifested in the FAA, any doubt regarding the applicability of an arbitration clause is "to be resolved in favor of arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 504 (6th Cir. 2007) (quoting *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004)); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

When a court is confronted with an arbitration clause as broad as the one included in the Branch Manager Agreement, the Sixth Circuit has indicated that the court should determine the applicability of the clause by considering whether the claims can be resolved without reference to the agreement containing the arbitration clause. *See NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 812–14 (6th Cir. 2008). If the claims can be resolved without reference to the agreement, then, most likely, the Court should not send the case to arbitration. *See id.* at 814; *Bollman*, 505 F.3d at 504.

**B.  Discussion**

    **1.  The Parties' Arguments**

Matalka responds to Home Point's Motion to Compel Arbitration by arguing (i) that the parties did not agree to arbitrate the claims raised in this case and (ii) that the claims do not fall within the scope of the arbitration clause. (*See* Resp. at 4–7, ECF No. 8.)

Matalka acknowledges that he is bound by the arbitration clause contained in the Branch Manager Agreement. (*See* Compl. ¶¶ 13–15, ECF No. 2.) He insists, however, that the parties did not agree to arbitrate the claims raised in the present case, which purportedly relate only to the oral contract and Matalka's work as a Regional Manager. (Resp. at 2.) The parties did not agree to arbitrate these claims, Matalka argues, because the arbitration clause covers "[a]ll

5

disputes, controversies and claims between *Branch Manager* and Employer," (Agreement § V(J), at PageID 58, ECF No. 5 (emphasis added)); the clause does not cover disputes between "Michael Matalka and Employer," "employee and Employer," or some other phrase that would cover Matalka in his Regional Manager capacity. (*See* Resp. at 4.) Matalka contends, moreover, that he did not agree to arbitrate claims relating to his work as a Regional Manager because he did not receive consideration from Home Point for such an agreement. (*See id.* at 5.)

Relatedly, Matalka argues that his claims do not fall within the scope of the arbitration clause. Matalka points again to the use of the phrase "Branch Manager" in the arbitration clause rather than Michael Matalka or employee. (*See* Resp. at 5.) He notes that the Branch Manager Agreement does not discuss Regional Manager duties and compensation, which are purportedly mutually exclusive of a Branch Manager's duties and compensation. (*See id.* at 5–7.) And he reiterates the distinction between the manager positions by indicating that he had to submit a separate application for each position. (*See id.* at 6.) These circumstances purportedly suggest that the Branch Manager Agreement does not govern Matalka's work as a Regional Manager and that the arbitration clause therefore does not cover Matalka's claims. (*See id.* at 5–7.)

Home Point disagrees with Matalka's assessment. The arbitration clause is so broad that it purportedly covers claims, like those asserted by Matalka, that are simply "tied to the employment relationship of the parties." (Mot. to Compel Arb. at 7, ECF No. 5.) Matalka's claims are tied to the Branch Manager Agreement and the parties' employment relationship, Home Point asserts, because Matalka must have been working under the Branch Manager Agreement when he performed work as a Regional Manager. (*See id.* at 7–8; Reply at 4, ECF No. 11.) According to Home Point, the Branch Manager Agreement prohibited Matalka from entering into the oral contract and becoming a Regional Manager. (*See* Mot. to Compel Arb. at

6

7–8; Reply at 4.) Home Point notes that the Branch Manager Agreement required Matalka to "work exclusively for [Home Point]" and not "directly or indirectly render any services related to the mortgage banking industry" or "prepare to engage in any such activities" without Home Point's prior written consent. (Agreement § II(A)(2), at PageID 47; *see* Mot. to Compel Arb. at 8.) Matalka agreed that he would "not enter into any agreement, contract or understanding that would restrict or prohibit [him] from undertaking or performing [his] obligations [as a Branch Manager]." (Agreement § II(A)(4)(h), at PageID 49.) And Matalka agreed that the Branch Manager Agreement constituted "the entire agreement between the parties," that there were "no written or oral agreements, understandings, representations or warranties between the parties other than those set forth [in the Branch Manager Agreement]," and that the Agreement could only be modified through a by a subsequent written agreement. (*Id.* § V(G), at PageID 58.)

But even if the Branch Manager Agreement did not prohibit Matalka from entering into the oral contract, the Agreement could still be interpreted to govern the work Matalka performed as a Regional Manager, Home Point contends. (*See* Mot. to Compel Arb. at 8–9.) The Branch Manager Agreement required Matalka "to perform such other services as [Home Point] may direct," (Agreement, Recitations, at PageID 46; *see also id.* § II(A)(1), at PageID 46), and stated that Matalka was not prohibited "from soliciting a third-party [to work] with [Home Point] or recommending to [Home Point] any third-party that may be able to promote [Home Point's] mortgage-related business"—activities that Matalka purportedly engaged in as a Regional Manager, (*id.* § II(B)(3), at PageID 52).

Lastly, Home Point avers that this case should be sent to arbitration because the Branch Manager Agreement's arbitration clause indicates that the "controversies" covered by the clause

7

include "all questions as to whether the right to arbitrate any question exists." (Agreement § V(J), at PageID 58–59; *see* Mot. to Compel Arb. at 8.)

**2.     Analysis**

The Court concurs with Matalka: the parties did not agree to arbitrate claims relating to the Matalka's work as a Regional Manager, and the arbitration clause does not cover such claims. Numerous elements of the Branch Manager Agreement, including, simply, the Agreement's title, establish that the parties intended the Agreement—and its arbitration clause—to apply only to Matalka's work as a Branch Manager.

The Agreement begins with a recitation of Home Point's desire to employ Matalka as a Branch Manager. There is no mention of employing Matalka as a Regional Manager:

> Employer desires to retain Branch Manager as an employee of Employer to act as a *branch manager* to conduct the business of Employer *through a designated branch operation* and to perform such other services as the Employer may direct, and Branch Manager desires to be so retained, in accordance with the terms of this Agreement.

(Agreement, Recitations, at PageID 46, ECF No. 5 (emphasis added).)

The Agreement continues with a description of Matalka's employment. Again, there is no mention of Matalka working as a Regional Manager. The description relates entirely to work that a Branch Manager would perform:

> Employer hereby agrees to employ Branch Manager, and Branch Manager agrees to provide for Employer the services as more specifically set forth in this Agreement, as a *branch manager* to provide management and oversight of *all branch operations and functions relating to Employer's branch office* located at 6833 Clark State Road ("Branch Office"). Branch Manager shall monitor and ensure that all *personnel of branch* are soliciting, originating, processing, and facilitating the closing and post-closing of quality residential mortgage loans for and on the Employer's behalf.

(Agreement § I, at PageID 46 (emphasis added).)

8

Matalka's obligations and responsibilities are then outlined in a section entitled "Obligation and Duties with Respect to Management of Branch." (Agreement § II(A), at PageID 46.) The subsection "Branch Manager Responsibilities" states that Matalka is responsible for "the management of the Branch Office" and other related duties, such as ensuring "the maintenance, cleanliness and general appearance of the Branch Office as a place of business and an office of Employer" and overseeing Branch Office employees. (*Id.* § II(A)(1), at PageID 46–47.) As to obligations, Matalka agreed to "devote the necessary time and energy to the business of the Branch Office and the Employer" and [to] actively work in and outside the Branch Office on a full-time, day-to-day basis." (*Id.* § II(A)(3), at PageID 48.) Matalka further agreed to "exercise full control and direction over all of the Branch Office's employees." (*Id.*)

The Agreement states that Matalka would receive a guaranteed salary. (Agreement § II(D)(2), at PageID 53.) Matalka's compensation was primarily based, however, "on the net profit of the Branch of Office." (*Id.* § II(D)(1), at PageID 53.) After Home Point collected "the revenue derived from the Branch Office's closed mortgage loan production during the applicable period and [paid] the Branch Office's expenses," Matalka received the remaining revenue as a commission. (*Id.*) Matalka received additional compensation if he originated loans. (*See id.* § II(D)(3), at PageID 53–54.)

The responsibilities, obligations, and compensation outlined in the Branch Manager Agreement are those of a Branch Manager—not a Regional Manager—as the Agreement repeatedly indicates. Almost every aspect of the position is explicitly linked to a specific branch office and the employees working there. (*See, e.g.*, Agreement §§ II, III, at PageID 46–55.) Although seemingly obvious, Matalka did not agree to be a Regional Manager in the Branch

9

Manager Agreement. He did not agree to do a Regional Manager's work. And Home Point did not agree to pay him a Regional Manager's compensation.

Matalka's claims relate to his work as a Regional Manager, and those claims can be resolved without reference to the Branch Manager Agreement, which deals solely with Matalka's work as a Branch Manager. As such, the Branch Manager Agreement's arbitration clause does not apply here. *See NCR Corp.*, 512 F.3d at 814; *Bollman*, 505 F.3d at 504.

Home Point's arguments to the contrary are unconvincing.

The arbitration clause does not cover claims that are simply "tied to the employment relationship of the parties." (Mot. to Compel Arb. at 7, ECF No. 5.) Rather, the arbitration clause applies to all "disputes, controversies and claims . . . arising out of or relating directly or indirectly *to this Agreement*." (Agreement § V(J), at PageID 58 (emphasis added).) And the Agreement, as noted, is for Matalka's employment as a Branch Manager. (*See id.* at PageID 46.)

Home Point suggests that the "Exclusive Employment" provision of the Branch Manager Agreement prohibited Matalka from assuming a position with Home Point other than his position as a Branch Manager. (Agreement § II(A)(2), at PageID 47; *see* Mot. to Compel Arb. at 7–8.) But the provision does not read that way. It focuses on limiting Matalka's ability to work *for other employers*. (*See* Agreement § II(A)(2), at PageID 47–48 ("During the term of this Agreement, Branch Manager *shall work exclusively for Employer* and shall not be employed by any other real estate, mortgage or finance related entity." (emphasis added)).) The provision, for example, states that Matalka "shall not conduct any business activities from Employer's offices *other than for Employer*." (*Id.* at PageID 48 (emphasis added).) And the provision allows Matalka "to maintain current and future business interests *in non-competing businesses* as long as they are fully disclosed and approved by [Home Point] and as long as they do not conflict with

10

[Matalka's] duties and responsibilities." (*Id.* at PageID 47 (emphasis added).) The "Exclusive Employment" provision provides for Matalka's exclusive employment with Home Point—not Matalka's exclusive employment as a Branch Manager. (*See id.*)

That Matalka was not permitted to "directly or indirectly render any services related to the mortgage banking industry" or "prepare to engage in any such activities" does not bar Matalka from taking a Regional Manager position with Home Point either. (Agreement § II(A)(2), at PageID 47.) The prohibition against rendering services related to the mortgage banking industry simply expands on the earlier prohibition on Matalka working for an entity other than Home Point. (*See id.*)

Home Point notes that Matalka agreed to "not enter into any agreement, contract or understanding that would restrict or prohibit [him] from undertaking or performing [his] obligations [as a Branch Manager]." (Agreement § II(A)(4)(h), at PageID 49; *see* Mot. to Compel Arb. at 3.) But Home Point has not offered any evidence, or presented any arguments, suggesting that Matalka's work as a Regional Manager actually restricted or prohibited him from performing his obligations as a Branch Manager. And even if Matalka's work as a Regional Manager did diminish his performance as a Branch Manager, Matalka's underperformance as a Branch Manager would have no relevance to the claims in this case, which deal with Matalka's work as a Regional Manager.

Home Point contends that the Branch Manager Agreement is "the entire [a]greement of the parties" and can only be modified by a subsequent written agreement; this fact purportedly prevented Matalka from entering into the oral contract and becoming a Regional Manager. (Mot. to Compel Arb. at 8.) The Agreement's text undermines this argument. The "Entire Agreement" provision states in relevant part: "This Agreement and accompanying Addendum shall constitute

11

the entire agreement between the parties and supersede all prior agreements, arrangements and understandings *relating to the subject matter thereof.*" (Agreement § V(G), at PageID 58 (emphasis added).) The Branch Manager Agreement, in other words, is the entire agreement only on issues relating to Matalka's employment as a Branch Manager. (*See id.*) Because the oral contract did not relate to that subject matter, Matalka could enter into the oral contract without having to modify the Branch Manager Agreement.

The parties' representation in the "Entire Agreement" provision that "[t]here are no written or oral agreements, understandings, representations or warranties between the parties other than those set forth herein and therein" is also informed by this qualifying language. (Agreement § V(G), at PageID 58.) The parties represented that there were no other agreements between them relating to Matalka's employment as a Branch Manager—not that the parties had no other agreements at all.

The Court finds equally without merit Home Point's assertion that the Branch Manager Agreement governed the work that Matalka performed as a Regional Manager. Provisions in the Agreement indicating that Matalka would perform "such other services as [Home Point] may direct" and that Matalka would assume responsibility for "other such duties and services as may from time to time be assigned" come from paragraphs in which the parties clearly indicated that Matalka would be working as a Branch Manager. (Agreement, Recitations, § II(A)(1), at PageID 46.) These vague, catch-all provisions do not transform the Branch Manager Agreement into an Any-Employment-Assigned Agreement.

That the Branch Manager Agreement does not prohibit Matalka from soliciting and recommending third-parties to Home Point, an activity that he might have engaged in as a Regional Manager, does not suggest that the Branch Manager Agreement governed Matalka's

12

work in that area. (*See* Mot. to Compel Arb. at 9.) The Agreement, in fact, offers no guidance on the solicitation of third-parties and the recommendation of those third-parties to Home Point except to state that Matalka is not prohibited from doing so. (*See* Agreement § II(B)(3), at PageID 52.)

And finally, the Court rejects Home Point's contention that the arbitrator must decide the arbitrability of this case. The arbitration clause states that all "disputes, controversies, and claims, between Branch Manager and Employer arising out of or relating directly or indirectly to this Agreement shall be resolved by final and binding arbitration." (Agreement § V(J), at PageID 58.) Because the arbitration clause defines "controversies" to include "all questions as to whether the right to arbitrate any question exists," (*Id.* at PageID 59), Home Point contends that the arbitrator must decide whether this case should be arbitrated. (*See* Mot. to Compel Arb. at 8.) The problem for Home Point is that Matalka's claims do not arise out of or relate, directly or indirectly, to the Branch Manager Agreement. They relate to Matalka's work as a Regional Manager. To overcome the presumption that the Court, not the arbitrator, determines whether a dispute should be arbitrated, the parties must show that they clearly and unmistakably agreed to have the arbitrator make the determination. *See AT&T Techs.*, 475 U.S. at 649. And here, the parties did not clearly and unmistakably agree that the arbitrator would decide the arbitrability of claims unrelated to the Branch Manager Agreement.

### III.

For these reasons, the Court **GRANTS** Home Point's Motion for Extension of Time to File Reply (ECF No. 10) and **DENIES** the Motion to Compel Arbitration (ECF No. 5).

**IT IS SO ORDERED.**

3-19-2018
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**

13